IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DENNIS ESCAREÑO,[1]

      Petitioner,

v.                                            CIV 01-202 LH/KBM

ERASMO BRAVO, Warden, and
ATTORNEY GENERAL for the
State of New Mexico,

      Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Dennis Escareño's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2254, *Doc. 1,* Respondents' Answer, *Doc. 10,* and the record proper from the state proceedings. Because Escareño filed after the effective date of Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Paxton v. Ward,* 199 F.3d 1197, 1204 (10th Cir. 1999). All of the issues can be resolved on the record, such that an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 121 S. Ct. 93 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under Section 2254.* Having considered the arguments, pleadings, and relevant law, I find the petition without merit and recommend that it be denied.

### I. Factual & Procedural Background

In 1999, a jury convicted Escareño of false imprisonment and aggravated battery of his

---

[1] Since parts of the state court records spell certain names with tildes, I spell them the same here.

coworker and girlfriend Jannine Blankenship (or "Stormy") and acquitted him of a charge of retaliation against a witness. Having been found to be a habitual offender with four prior convictions for forgery, burglary, and larceny between 1982 and 1992, his concurrent sentence of one and a half years was enhanced by eight years for a total term of imprisonment of nine and one-half years plus two years parole. *Answer,* Exh. A.

Because of the posture of the issues in the state court proceedings, it was necessary to listen to all of the tapes of the trial as well as review the record. A detailed summary of this evidence is necessary for disposition of this matter.

### A.  *Testimony At Trial* [2]

Although married, Ms. Blankenship was dating Escareño. Although the testimony is not entirely clear on this point, the relationship evidently was clandestine. While her sister knew of the relationship and a friend later learned of the nature of the relationship, there was no testimony that Ms. Blankenship's husband was aware of the relationship.

On the day in question, a Friday, Ms. Blankenship took personal items to Petitioner's home in anticipation of spending the night there. She had been drinking throughout the day and she, along with Defendant and others, continued drinking that evening. According to Ms. Blankenship, late that evening Defendant became upset over her dancing with other men and they argued. She left the bar at approximately 1:00 a.m. and went to his home to retrieve her things.

She waited on his front porch until he arrived after the bar closed at approximately 2:00 a.m. Saturday morning. Inside the house as she was changing clothes and gathering her things,

---

[2] The State submitted an index to the tapes, which provides a log of each tape and a brief description of the testimony at various points throughout the tape. I have not cited specific portions of the tapes for the testimony and instead refer the reader to the index.

they argued again.  She wanted to leave and Escareño insisted she "wasn't going anywhere" because they had planned to spend the weekend together.

She testified that he pushed her onto the couch and she attempted to get up, telling him to leave her alone and let her leave.  He pushed her onto the couch again and as she stood up pushing at him he hit her with his fist on the left temple, knocking her to the floor.  Petitioner put his knee on her chest, pinning her to the floor, and began to "continuously" hit the left side of her head with his fist while saying "you're not going anywhere."  When Ms. Blankenship tried to push him off, Escareño became angrier and bit her on the finger.  As she attempted to crawl across the floor to get away, he grabbed her by the ears and "jerked" her back onto the couch where he pinned her again and began choking her.  While she was being choked, she stuck her tongue out and he bit it.  As she fought back, he became "ballistic/psycho" saying  "I'll f***ing kill you."  Ms. Blankenship stopped fighting, but that only made the beating worse.

Then Juan Ybañez, one of Escareño's roommates, came in through the back door.  His entry startled Petitioner and gave Ms. Blankenship the opportunity to flee.  She fled out the back door where Escareño chased her around a truck.  She implored Mr. Ybañez to help, but he did not intercede.  Escareño told her he would give her a ten-second head start before he "beat her to death."  Ms. Blankenship ran down an alley and into the street, where she saw a police officer.

Officer Louis Jordan testified that he was driving by and saw Ms. Blankenship running down the street with a torn shirt, blood around her mouth and crying out for help.  He pulled along side her and offered assistance.  She kept running and he called for backup assistance.  Officer Jordan momentarily lost sight of her and then saw her laying in the street.  Ms. Blankenship said "he beat me" and said her jaw hurt, but would not identify the assailant.  Officer

Jordan noticed she had urinated on herself. The officers called for an ambulance and Ms. Blankenship was transported to the emergency room where she received a injection of painkiller medication. Officer Jordan admitted on cross-examination that Ms. Blankenship's conduct was consistent with people who are intoxicated.

Ms. Blankenship's sister, Judy Evans, received a call from the police around 3:15 a.m. asking her to go to the hospital. Ms. Evans saw her sister in the emergency room and noticed blood on her mouth and in her eye, and that the left side of her face and ear were swollen. She described her sister as "freaked out" -- "scared to death." Only after Ms. Evans threatened to involve her father did Ms. Blankenship tell her sister what had happened. Another officer went to the hospital to make a report, but he found Ms. Blankenship was then too intoxicated and asked her to do so later. Ms. Blankenship testified that although she spoke with the officers at the hospital, she did not give them a report because she was afraid.

Ms. Evans did not talk to the officers at the hospital. Instead, sometime between 4:00 and 5:00 a.m. while her sister was being x-rayed, Ms. Evans went to the Blankenship home to check on her niece. There she met an officer who was sitting outside of the house in a truck. Ms. Evans asked if "Dennis" had been arrested and took the officer to the street where he resided. She then returned to the hospital.

While Ms. Blankenship was in the emergency room, two officers went to Escareño's home to ask if he had her purse. Petitioner said he did not and refused consent to let them look for it. He admitted that he had been with Ms. Blankenship but denied hitting her. Escareño's speech was slurred, and they did not observe any injuries on him, such as bruises or scratches.

Upon being discharged from the emergency room around 5:00 a.m. Saturday morning,

Ms. Blankenship signed a release form which contained instructions for follow-up care. The form mentions only a head injury and was admitted into evidence. When defense counsel showed her what I believe was another hospital document that indicated she reported "moderate" pain, she did not recall telling that to the hospital personnel. She also testified that she did not recall complaining to them about injuries to her tongue or finger.

    Ms. Evans drove Ms. Blankenship home from the hospital and stayed a few minutes. After she returned to her own home, Ms. Evans received a telephone call from Escareño who said "if your c*** sister involves the law the whole family is gonna die." Meanwhile, after arriving home, Ms. Blankenship called her friend Cathy Marthaller around 5:10 a.m. asking her to stay with her because she was scared. Ms. Marthaller arrived within minutes with a loaded weapon. She observed, among other things, that Ms. Blankenship's face was swollen, she had red marks on her neck, bruises all over, and was bleeding at her mouth and finger. Several calls were made to the Blankenship residence between 5:30 and 6:30 a.m. Ms. Blankenship responded to one of them, and it was Escareño asking why she sent "cops after him" and threatening to kill her entire family if he went "back to jail." Ms. Marthaller answered another, and it was Escareño who said "I'm going to kill Stormy and her entire family for this sh**." Later that evening, Ms. Blankenship received a voicemail message from Escareño who said in a menacing voice, "you're dead." A tape of that message was played for the jury.

    According to the officer who prepared the complaint, Ms. Blankenship and her sister gave a statement on Sunday. At that time Officer Robert West observed Ms. Blankenship's face was swollen, she had bruises in numerous places, blood in her eyeball, a cut and swollen tongue, and a cut on her finger. He took at least six photographs of her at the station. They turned out poorly,

which he attributed to a worn-out camera that flashed inside and washed out the images. He identified all of these photographs at trial. Four of them, where bruising could be seen, were admitted into evidence.[3]

The complaint (or "report") made by Officer West contains a description of the beating inside the house. It also includes a contested passage regarding Ms. Blankenship's flight from Petitioner's house – that Ms. Blankenship ran down the alley and into the street and the next thing she remembered was a police officer waking her up where she was laying in the street. Officer West testified that he remembered Officer Jordan telling him only that he had found the victim laying in the street. Officer Jordan, however, recalled that he did not assist Officer West in preparation of the complaint. Officer West also testified that Ms. Blankenship had related to him that she remembered running down the alley and waking up in the road as stated in the report. She denied making that statement to Officer West, and testified that she had told him she ran down the alley into the street and saw Officer Jordan.

Yet another portion of Officer West's report relates to a conversation he had with Mr. Ybañez. Because a warrant for his arrest was pending at the time, Mr. Ybañez called Officer West instead of meeting him in person to give a statement. Officer West, who had never seen Mr. Ybañez or heard him talk, took the call. Mr. Ybañez related that he saw Ms. Blankenship run out of the house when he opened the door, run around the truck yelling for help and then running down the alley. On cross-examination, Officer West admitted that since this version corroborated Ms. Blankenship's story, he did not do any further investigation such as following up personally

---

[3] The photographs and other documents admitted at trial were not submitted with the record proper. However, what they depicted were described sufficiently in the testimony and their absence is not material to the disposition of this matter.

with Mr. Ybañez.

Officer West also obtained a medical release and had the hospital fax him Ms. Blankenship's medical records. On cross-examination at trial, he could recognize only two of those documents as those that were faxed to him. He conceded, however, that the rest shown to him by defense counsel appeared to be the same as those he received from the hospital and placed into the evidence locker. Officer West also stated that he could not interpret the documents. The trial judge refused to allow admission of those documents. Defense counsel objected to the ruling.

Five days after the incident, Ms. Marthaller took more pictures of Ms. Blankenship. These photographs were also introduced into evidence and more clearly showed the severe bruising to various parts of Ms. Blankenship's body, the swelling in her face, and blood in her eyeball. The testimony of Ms. Blankenship, Ms. Evans, and Ms. Marthaller indicated that the bruising became more prominent over time, that the bruising lasted about three to four weeks, and the jaw pain lasted about two months.

The defense introduced its theory of the case through cross-examination and one witness, Mr. Ybañez. Petitioner did not take the stand. Mr. Ybañez testified that when he arrived home, he was in the house for about half an hour changing and saw nothing. He believed he arrived home around 11:00 p.m. but was not sure. When he went back outside, he saw Escareño and Ms. Blankenship running around the truck "playing" – the type of physical "horseplay" (slugging, wrestling) they engaged in when they were drinking. Mr. Ybañez indicated that Ms. Blankenship did not ask for help nor did he perceive her as needing any help. He said he did not see her run down the alley. Further, he denied making a statement to Officer West that he had seen Ms.

Blankenship run out of the house when he opened the door, run around the truck yelling for help and then running down the alley.

### B. Closing Arguments

Defense counsel argued in closing that despite Ms. Blankenship's assertion that she was not intoxicated and was only "feeling the effects" of alcohol, all of the other evidence indicated that she consumed alcohol all day and evening on Friday and was still intoxicated while at the hospital. Her behavior in running away from the police was argued to be consistent with a drunk person. Counsel did not dispute that a heated argument ensued when Defendant attempted to keep her from leaving his house, but he argued that it out of concern for her condition. Counsel conceded that some of the injuries could have occurred then. He maintained, however, that some of the other injuries occurred as Ms. Blankenship stumbled around the house changing and picking up her things while drunk, as well as when she fell in the road.

Thus, a critical component of the defense was that the serious injuries depicted in the photographs taken five days after the incident were the result of something that happened after the incident in question. Counsel argued that another set of photographs was taken later because neither the first set of photographs nor the hospital records document injuries as serious as those depicted in the later photographs. Specifically, he said:

> I don't want to insult you, nor do I mean to imply that all of the injuries she received occurred from her falling down in the street. Indeed, I submit they did not. I submit that the injuries she received occurred inside the house, but not from Dennis Escareño. Just as she was falling down in the street outside – running into things inside the house. She told you she had stuff under the bed when she was putting it all together. Maybe she did, maybe she didn't. Maybe she only thought she did.

\* \* \* \* \*

8

> Why wait four to five days to take pictures of injuries that supposedly occurred earlier. It's wonderful, it's wonderful for the state to walk in here and say: "Well our equipment's not any good and our pictures aren't any good, I'm sorry." What you've got is what you've got with those pictures and they don't depict the injuries that you see on those photographs that were taken four to five days later. If you go to a hospital and you have those kind of injuries, those kinds of injuries are documented in the hospital records. And if they'd been documented in the hospital records, those records would have been introduced by the state to prove their case. But they weren't. What inference can you draw from that fact. The jury instructions say you're not supposed to speculate . . . but you are entitled, and you are asked to, draw inferences from the testimony.
>
> * * * * *
>
> I'm not surprised at some of the bruising you see on her arms. If you look at them and imagine the contest, the struggle. Mr. Escareño has never said: "I didn't try to stop her from leaving. Quite the contrary. I suggested to you that he did care for this woman. That she was too drunk to be running out in the street by herself, barefooted. . . . He didn't want her running out there. He saw what she was doing inside the house."

Counsel also pointed out inconsistencies in the evidence such as: Escareño had no marks on him right after the fight, yet the five-day old photographs showed quite a battle; Ms. Marthaller testified Ms. Blankenship's mouth and finger were bloody after she had returned from the emergency room; and Petitioner's allegedly threatening call warning her not to "sic the cops" on him was made after officers questioned Defendant at his house.

In response to defense counsel's comment about what injuries occurred inside the house, the prosecutor commented as follows in rebuttal:

> [Defense counsel] said Mr. Escareño saw what she was doing inside the house. Well, where is all this evidence. Not a shred has been provided to you that anything other than what Jannine told you happened inside that house happened.

In response to an inaudible objection and bench conference the trial judge ruled: "Well, let's not –

9

We don't have time to do that – Let's be careful what we say on this. Let's go ahead." The prosecutor continued, "Anyway, there's no evidence as to what went on inside that house besides what Jannine told you."

### *B. State Proceedings*

As discussed in more detail below, Escareño pursued a number of issues on direct appeal through the public defender, which were denied on direct appeal in a memorandum decision and were denied a grant of certiorari by the New Mexico Supreme Court. *See Exhs. B-K.* Escareño pursued some of these and other issues *pro se* in state habeas proceedings. The trial judge summarily denied relief and, after requiring a response and granting itself several extensions, the New Mexico Supreme Court denied certiorari. *See Exhs. N-W.*[4]

This timely federal petition followed, where Defendant incorporates by reference the claims raised in his state habeas petition and petition for certiorari and asks this Court to consider them. *See Doc. 1* at 6, 7, 9. Construing the federal and state petitions together and construing these pleadings liberally, Escareño raises a number of interrelated issues that focus primarily on the trial court excluding the medical records Officer West could not identify.

### **II. Analysis**

Under AEDPA, if a state court decides a claim on the merits its decision is entitled to "deference" and a federal court cannot grant a writ of habeas corpus unless: (1) the state court decision is "contrary to, or involved an unreasonable application of . . . Supreme Court" precedent; or (2) is "an unreasonable determination of the facts in light of the evidence

---

[4] Petitioner attributes the extensions to the New Mexico Supreme Court awaiting the outcome of the presidential elections. *Doc. 1* at 4.

presented." 28 U.S.C. §§ 2254(d)(1)-(2); *see also* *Williams v. Taylor,* 529 U.S. ___ , 120 S. Ct. 1495 (2000); *Van Woudenberg v. Gibson,* 211 F.3d 560, 566 & n. 4 (10th Cir. 2000), *cert. denied,* 121 S. Ct. 1117 (2001). Factual findings made by the state courts are entitled to a presumption of correctness unless a petitioner can rebut the finding by clear and convincing evidence. 28 U.S.C. § 2254(e).

With the exception of the prosecutorial misconduct claim, although the state decisions clearly rejected Petitioner's claims on the merits, the opinions do not specifically address the federal constitutional issues or cite federal decisions. Furthermore, the prosecutorial misconduct in closing claim was made without the benefit of the exact wording of the entirety of the closing arguments. Instead, the court ruled that defense counsel "opened the door" by his statements that the "only two people in the home were the victim and Defendant" and "the State's theory of what had happened was not supported by any other evidence than the testimony of the victim." *Exh. H* at 4. However, this is not what the tape of closing arguments reflects. Rather, the quoted language more accurately characterizes what the prosecutor said as points in his rebuttal.

It is not definitively settled whether application of the deferential AEDPA standards under these circumstances is warranted.[5] Nevertheless, I find that the analysis outlined in *Aycox v.*

---

[5] Two Tenth Circuit panels have questioned whether AEDPA deference is warranted when the state court does not address the federal constitutional claim. The relevant portion of the unpublished opinion is quoted below in full and, as such, I will not attach it.

> Although Mr. Stuckey presented his due process claim regarding the exclusion of evidence to the Kansas Court of Appeals on direct appeal, that court did not explicitly address Mr. Stuckey's claim on due process grounds. Instead, its analysis relied on state law. *See State v. Stuckey,* No. 74, 853, slip op. at 205 (Kan. Ct. App. Feb. 21, 1997) (unpublished). While it might be arguable that we need

11

*Lytle,* 196 F.3d 1174 (1999), should control.

In *Aycox,* the Tenth Circuit explained that the state court need not mention federal law or even contain much reasoning to qualify as an "adjudication on the merits." As long as a claim is decided on the merits and not a state procedural ground, the state decision is entitled to deference. *Id.* at 1177. But where there is no reasoned application of the law to the facts, the federal habeas court must engage in an independent review of the record and pertinent federal law to ascertain whether the state's result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented. This "independent review" should be distinguished from a full *de novo* review of petitioner's claims. *See id.* at 1177-78.

### A. Interrelated Medical Records Claims

As argued on appeal, defense counsel arranged for an expensive expert to testify, but the Public Defender Office refused to pay for the witness. Counsel informed the trial judge of the

---

> not defer to the state court decision in this situation, c*f. Smith v. Scott,* [223 F.3d 1191, 1193 n.1 (10th Cir. 2000)], Mr. Stuckey not only fails to challenge the district court's use of this standard, but he encourages our application of it on appeal. We therefore will view the state court's decision as implicitly rejecting his federal claim, and will defer to its result. *See Aycox v. Lytle,* 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's result, even if its reasoning is not expressly stated.").

*Stuckey v. Koerner,* 229 F.3d 1164, 2000 WL 1346394 at *1 (10th Cir. 9/19/00). In *Smith,* which is cited in *Stuckey,* the Tenth Circuit noted that Petitioner presented an *ex post facto* claim to the state court based on the argument that rescinding earned time credits violated the clause. The state court summarily denied relief saying only that prisoners have no right to an earned credit level. The Tenth Circuit found that the state's "decision does not address Mr. Smith's *ex post facto claim* 'on the merits.'" 223 F.3d at 1193 & n.1.

same at a bench conference when he was attempting to introduce the documents through Officer West.  On appeal, counsel also noted he failed to move for a continuance when the medical records were not admitted.  *See Exh. C* at 3; *Exh. G* at 5; *Exh. I* at 2-3, 4.  In his petition for certiorari, Escareño explained that the "hospital employees would have testified that the injuries that were photographed 5 days after the incident were not present on the woman when she was brought to the hospital" and that "an expert witness would have been able to say how long it takes a black eye to become black after the injury occurs and whether the photographed injuries [five days later] were consistent with those reported by the hospital personnel."  *Exh. R* at 2.  Thus, Escareño does not dispute, not could he, that defense counsel was in *possession* of the medical records before trial.

    Instead, he argues that he is "factually innocent" and the medical records, which prove his innocence, were "exculpatory" under *Brady v. Maryland,* 373 U.S. 83 (1963).  He further contends that "[e]ven if the hospital personnel's testimony and that of the medical expert did not establish Petitioner's complete innocence it surely would have shown reasonable doubt."  *Exh. R* at 2.  As such, he argues the officers were obliged to interview the hospital personnel in person, the prosecutor was obliged to introduce the records through the testimony of hospital personnel, and the trial judge abused his discretion in not admitting the documents through Officer West to remedy counsel's "ineffectiveness."  Escareño asserts that these actions violate his rights to due process, right to compulsory witnesses, and establish that Ms. Blankenship provided perjured testimony.  He also argues that counsel was ineffective for failing to call hospital witnesses and an expert witness, and (presumably) for failing to request a continuance.  All of these arguments are without merit.

13

In a purely adversary system the prosecution would have no obligation to assist the defense in any way. The *Brady* rule, based in due process, does not require the prosecutor to disclose every aspect of its case. Rather, *Brady* represents a limited departure from that system, requiring prosecutor to only to disclose exculpatory evidence. In any event, the prosecutor's the duty ends with disclosure. *E.g., United States v. Bagley,* 473 U.S. 667, 675 & n.1 (1985).[6] Furthermore, any obligation on the part of officers or investigators is to turn over the exculpatory information to the prosecutor.[7] The requisite disclosure of the medical records to the prosecutor

---

[6] *See also e.g., Grey v. Netherland,* 518 U.S. 152 (1996), where the court noted:

> A defendant's right to notice of the charges against which he must defend is well established. . . .  But a defendant's claim that he has a right to notice of the evidence that the state plans to use to prove the charges stands on quite a different footing. We have said that the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded. . . .  There is no general constitutional right to discovery in a criminal case, and *Brady,* which addressed only exculpatory evidence, did not create one. . . .  To put it mildly, these cases do not compel a court to order the prosecutor to disclose his evidence.

*Id.* at 168 (internal quotations and citations omitted); *see also Banks v. Reynolds,* 54 F.3d 1508, 1517 (10th Cir. 1995) ("The prosecution is not required under *Brady* to make a complete and detailed accounting to the defense of all police investigatory work on a case, . . . nor must the prosecutor disclose possible theories of the defense to a defendant. . . . It must only disclose exculpatory evidence.") (internal quotations and citations omitted).

[7] *See Jean v. Collins,* 221 F.3d 656 (4th Cir. 2000), *cert. denied,* 121 S. Ct. 771 (2001).

> The Supreme Court decisions establishing the *Brady* duty on the part of prosecutors do not address whether a police officer independently violates the Constitution by withholding from the prosecutor evidence acquired during the course of an investigation. . . . . Recent cases, including some from this circuit, have pointed toward such a duty. This court has noted that, [a] police officer who withholds exculpatory information from the prosecutor can be liable under . . . section 1983, . . . but only where

14

and to defense counsel was done in this case. I have found no decision extending *Brady* beyond disclosure to require that a prosecutor introduce the allegedly exculpatory evidence during trial.

Petitioner makes the blanket assertion for all of his claims that under *United States v. Cronic,* 466 U.S. 648 (1984), he is entitled to habeas relief without any showing of prejudice. However, *Cronic* is inapplicable. It applies to ineffective assistance of counsel claims and is the exception to the *Strickland v. Washington,* 466 U.S. 668 (1994) requirement that even if counsel's performance was constitutionally deficient, a petitioner must also show prejudice. Because Escareño's attorney "was present in the courtroom . . . conducted . . . cross-examination, made evidentiary objections, and gave a closing argument . . . this case falls outside the narrow *Cronic* exception." *Cooks v. Ward,* 165 F.3d 1283, 1296 (10th Cir. 1998), *cert. denied,* 528 U.S. 834 (1999). Thus, there is no constitutional infirmity under due process, compulsory process, or right to counsel, absent a showing that the evidence was "critical," that is, there is a reasonable

---

> the officer's failure to disclose the exculpatory information deprived the § 1983 plaintiffs of their right to a fair trial.

*Id.* at 659 (internal quotations and citations omitted). Similarly, the Eleventh Circuit noted in the context of a Section 1983 lawsuit that

> [t]he Supreme Court has not explicitly addressed the disclosure duties of the police and other investigators under *Brady*. This court has noted, however, that investigators have no duty to disclose exculpatory and impeachment evidence to the defense. . . . The Constitution imposes the duty to disclose exculpatory and impeachment evidence to the defense on the prosecutor. . . . Investigators satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor.

*McMillian v. Johnson,* 88 F.3d 1554, 1567 (11th Cir.) (citations omitted), *amended in part,* 101 F.3d 1363 (11th Cir. 1996) (sovereign immunity section), *cert. denied,* 521 U.S. 1121 (1997).

15

probability introduction of the medical records would have changed the jury's result. *See e.g., Moore v. Marr,* ___ F.3d ___, 2001 WL 744962 (10th Cir. 7/3/01); *Gonzales v. McKune,* 247 F.3d 1066, 1075 (10th Cir. 2001); *Romano v. Gibson,* 239 F.3d 1156, 1166 (10th Cir. 2001); *Boyd v. Ward,* 179 F.3d 904, 921 (10th Cir. 1999), *cert. denied,* 528 U.S. 1127 (2000).

Here, the trial tapes establish that the result would have been the same even if the medical records and expert testimony were introduced. First, the defense *did* introduce documentary evidence in support of its theory that the hospital records did not corroborate all of the injuries which Ms. Blankenship accused Defendant of inflicting. The defense introduced the hospital release showing only a "head" injury on which counsel cross-examined Ms. Blankenship about a report of "moderate" pain. Counsel also introduced the same theory through cross-examination of the witnesses as well as argued the point in closing argument. He stressed that although the jurors could not speculate, they could draw inferences, and pointed out the prosecution had not introduced the medical records. A natural inference, which the jury undoubtedly recognized, is that the prosecution did not introduce the medical evidence because the records were not as helpful to its case as the pictures and testimony were.

Petitioner's arguments ignore the other compelling evidence of Ms. Blankenship's condition when she was at the hospital or immediately thereafter. For example, Ms. Evans described the way her sister appeared at the hospital. Ms. Marthaller detailed how her friend looked immediately after returning from the hospital. Officer West described Ms. Blankenship's appearance the next day when he took pictures, some of which showed the bruising and which were introduced into evidence. Moreover, the jurors were entitled to rely on their common sense and experience in assessing whether the results of a beating appear more pronounced in the days

16

following a beating.

In short, I find the evidence against Escareño nothing short of overwhelming. Accordingly, I find the state courts' denial of relief neither "contrary" nor "unreasonable" under controlling AEDPA standards.

### B. Prosecutorial Comment On Defendant's Failure To Take The Stand

It is generally "improper for a prosecutor to comment on a defendant's decision to refrain from testifying at trial," particularly, as here, where the "prosecutor's remarks concern matters that could have been explained only by the accused" thereby giving "rise to an innuendo that the matters were not explained because [petitioner] did not testify." *Battenfield v. Gibson,* 236 F.3d 1215, 1225 (10th Cir. 2001) (internal quotations and citations omitted); *see also Griffin v. California,* 380 U.S. 609, 615 (1965); *Pickens v. Gibson,* 206 F.3d 988, 999 (10th Cir. 2000). On the other hand, a prosecutor can "comment on a defendant's failure to call certain witnesses or present certain testimony." *Battenfield,* 236 F.3d at 1225 (internal quotations and citations omitted); *see also Trice v. Ward,* 196 F.3d 1151, 1167 (10th Cir. 1999), *cert. denied,* __ U.S.__, 121 S. Ct. 93 (2000).

Prosecutorial comments must be evaluated in context. Where, as here, the prosecutor responds in rebuttal to arguments raised by defense counsel in closing, the prosecutor's comments are not improper:

> The Supreme Court has recently reminded us that reviewing courts must examine the prosecutor's remarks in the context of the entire record to assess whether they constitute prejudicial error. . . . Thus, "to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo. . . . Although it is difficult to draw a bright line separating vigorous

17

> advocacy from prosecutorial misconduct, *it is clear that the prosecutor's remarks in this case, when viewed in the context of the entire record, were directed at what defense counsel had said during his closing argument, not at what appellant had failed to say by not testifying at trial.* The prosecutor had already told the jury that, in his view, opposing counsel had assumed facts not in evidence, and *although he might have chosen his words more carefully in illustrating this point, it is clear that his language was not manifestly intended or of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.* . . . We therefore conclude that the prosecutor's remarks did not violate appellant's fifth amendment privilege against self- incrimination.

*United States v. Hooks,* 780 F.2d 1526, 1533 (10th Cir.) (emphasis added), *cert. denied,* 475 U.S. 1128 (1986). Similarly, the Supreme Court has held that when

> the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.

*United States v. Robinson,* 485 U.S. 25, 31-33 (1988).

Thus, I find there was no improper comment on Escareño's failure to take the stand. Even if the comment were considered improper, I still find no violation of constitutional magnitude. Again, despite Petitioner's blanket assertion that he is entitled to habeas relief without a showing of prejudice under *Cronic,* allegations of improper prosecutorial comment on silence are "subject to a harmless error analysis." *Battenfield,* 236 F.3d at 1225 (internal quotations and citations omitted). One relevant factor in this inquiry focuses on the instructions to the jury. Although defense counsel did not refer to a defendant's right not to testify in his closing argument and although the trial judge did not give a cautionary instruction when the prosecutor made his

remark, Jury Instruction 11 provided, "You must not draw any inference of guilt from the fact that the defendant did not testify in this case, nor should this fact be discussed by you or enter into your deliberations in any way."  I note this instruction was the only instruction in a typeface larger than the rest.  *Record Proper* at 71.[8]  Yet another relevant factor is the evidence against Escareño, which I find to be overwhelming as noted above.  *See Pickens,* 206 F.3d at 999 (prosecutor's comment that evidence was uncontradicted/uncontroverted; held that, "[i]n any event, in light of the overwhelming evidence of petitioner's guilt, these remarks were also harmless").

Wherefore,

**IT IS HEREBY RECOMMENDED THAT** the petition be denied and that this action be dismissed with prejudice.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE

---

[8]  *See Battenfield,* 236 F.3d at 1225 ("the trial court sustained the objection and admonished the jury to disregard the comment.  In light of the general presumption that a jury follows a trial court's instructions, *see Weeks v. Angelone,* 528 U.S. 225, 120 S. Ct. 727, 733 (2000), we are persuaded that the trial court's admonition was sufficient to cure any error arising out of the prosecutor's comment."); *United States v. Hernandez-Muniz,* 170 F.3d 1007, 1011 (10th Cir. 1999) ("In addition, the trial judge instructed the jury that it could not take defendant's silence into consideration, and defense counsel reminded the jury of this fact in his closing.  Viewing the prosecutor's argument in its totality, we do not find it infringed on Hernandez-Muniz's Fifth Amendment or due process rights.").